UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORTH COAST SEA-FOODS CORP., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 17-cv-12534-ADB |
| PHILADELPHIA INDEMNITY | * | |
| INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

     Plaintiff North Coast Sea-Foods Corp. ("North Coast") brings claims for breach of

contract and for a declaratory judgment arising from Defendant Philadelphia Indemnity

Insurance Company's ("PIIC") refusal to defend and indemnify North Coast pursuant to an

insurance policy. Currently before the Court are cross motions for summary judgment. [ECF

Nos. 15, 21]. For the reasons discussed herein, PIIC's cross motion for summary judgment is

<u>GRANTED</u>, and North Coast's motion for summary judgment is <u>DENIED</u>.

**I.     BACKGROUND**[1]

     North Coast is a Massachusetts seafood wholesaler that relied on Diamond Staffing

Services, Inc. ("Diamond") for some of its staffing needs. North Coast Facts ¶¶ 1, 12. On

March 8, 2009, North Coast and Diamond entered into a six-page Temporary Staffing Services

Agreement (the "2009 Agreement"). <u>Id.</u> ¶ 1. It is North Coast's general practice to have a

---

[1] The following facts are drawn from North Coast's and PIIC's statements of undisputed material
facts and from the exhibits submitted in support. [ECF No. 17 ("North Coast Facts"); ECF No.
23 ¶¶ 36–45 ("PIIC Facts")].

master written agreement with its staffing agency and to change the rates on a periodic basis.  Id. ¶ 11.  The 2009 Agreement included provisions with headers such as "Terms of Agreement," "Scope of Agreement," "Safety," "Client and Diamond Staffing Obligations," as well as a lengthy section concerning "Proprietary Information."  [See ECF No. 15-4 at 1–5].  There are also sections of the 2009 Agreement that cover insurance, workers' compensation, and indemnity.  Id. at 4.  The indemnity clause of the 2009 Agreement provided, in pertinent part:

> [Diamond] unconditionally indemnifies, holds harmless, protects and defends [North Coast] . . . against any and all claims, demands, damages, injuries, deaths, actions, costs and expenses and all other consequences of any sort, regarding any claim by any [Diamond] Employee related to or arising out of any workplace Injury . . . . The provision shall survive the termination of this Agreement.

Id. at 4.

Paragraph 4 of the 2009 Agreement, titled "Rates and Invoicing," states that "[t]he rates for the Services will be set forth in Attachment A.  Id. at 2.  Attachment A, which is attached to the 2009 Agreement and numbered as page 7, is a one-page rate sheet that specifies costs for temporary employees and day laborers.  It also states, in part:

> Terms will remain in effect for a period of 3 years beginning on the date this Agreement is signed.

> If you choose to terminate our business relationship following the full length of the term of agreement, a thirty (30) day written notice is required, at which time all outstanding invoices must be paid in full.

Id. at 7.  North Coast and Diamond signed both the Services Agreement and Attachment A on March 8, 2009.  Id. at 6–7; see also North Coast Facts ¶ 1.

The 2009 Agreement states that it "will continue in effect until March 3, 2012."  [ECF No. 15-4 at 1].  On March 9, 2012, after the 2009 Agreement expired, North Coast and Diamond signed the "2012 Agreement," which was drafted by Diamond.  North Coast Facts ¶ 17; [see ECF No. 15-6].  North Coast did not seek advice from counsel before signing the 2012

Agreement, and there is no record of PIIC making any representation that the 2009 Agreement's terms and conditions would continue in effect. PIIC Facts ¶¶ 44–45. The 2012 Agreement is similar in format and length to Attachment A to the 2009 Agreement in that it is a one-page document that primarily focuses on rates and costs. The 2012 Agreement contains all of the terms of Attachment A to the 2009 Agreement and additionally includes the following: a commitment by Diamond to maintain general liability insurance; workers' compensation insurance, and liabilities concerning unemployment benefits; a statement that the rate will automatically renew at the end of the term; a provision concerning minimum wage adjustments; and a requirement that "invoices are Due Net 21 Days." [ECF No. 15-6]. Both Attachment A and the 2012 Agreement end with "[s]ignature below verifies and confirms terms and conditions between Diamond Staffing Services, Inc. and North Coast Seafoods." [ECF No. 15-4 at 7; ECF No. 15-6].[2] The 2012 Agreement does not have a separate services agreement, is not labeled as an attachment, does not explicitly refer to or integrate the 2009 Agreement, and makes no reference to indemnification. PIIC Facts ¶¶ 38–40; [see also ECF No. 15-6].

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation

---

[2] In this same sentence, the 2012 Agreement additionally allows Diamond to verify North Coast's bank and trade credit references. [ECF No. 15-6].

omitted).  "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. No. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." <u>Medina-Munoz</u>, 896 F.2d at 8 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986)).

## III.      DISCUSSION

The parties appear to agree that Massachusetts law governs the 2012 Agreement.  [<u>See</u> ECF No. 16 at 3; ECF No. 22 at 4].  "In interpreting a contractual agreement that employs clear and unambiguous language, [courts] look first to the ordinary meaning of the language in the contract." <u>City of Springfield v. Dep't of Telecomm. & Cable</u>, 931 N.E.2d 942, 946 (Mass. 2010).  Whether a contract is ambiguous, "presents a question of law for the court." <u>Bank v. Thermo Elemental Inc.</u>, 888 N.E.2d 897, 907 (Mass. 2008).  "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." <u>Id.</u>  "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" <u>Id.</u> (quoting <u>President & Fellows of Harvard Coll. v. PECO Energy Co.</u>, 787 N.E.2d 595, 601 (Mass. App. Ct. 2003)); <u>see also</u> <u>Bos. Edison Co. v. F.E.R.C.</u>, 856 F.2d 361, 365 (1st Cir. 1988) ("It is only when the written agreement, as applied to the subject matter, is in some material respect uncertain or equivocal in meaning that all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." (quotation marks omitted)).

Here, the 2009 Agreement expressly states that its term commenced on March 8, 2009 and concluded on March 3, 2012, and Attachment A states, "Terms will remain in effect for a

period of 3 years beginning on the date this Agreement is signed." [ECF No. 15-4].[3] Thus, the 2009 Agreement had terminated by the time the 2012 Agreement was signed. There is no provision in the 2012 Agreement that can be construed as expressing an intent to adopt the terms of the 2009 Agreement, and North Coast's arguments that the terms of the 2009 Agreement were intended to extend beyond March 2012 are unavailing.

First, North Coast argues that Attachment A to the 2009 Agreement contemplated an extension of the 2009 Agreement's terms beyond March 2012 by providing, "If you choose to terminate our business relationship following the full length of the term of agreement, a thirty (30) day written notice is required, at which time all outstanding invoices must be paid in full." [ECF No. 15-4; ECF No. 16 at 5]. Most importantly, the Court may not look to extrinsic evidence to inform the intent of the parties unless it first identifies an ambiguity in the language of the contract, which it has been unable to do here. See Thermo Elemental Inc., 888 N.E.2d at 907. Further, even assuming that the Court could consider extrinsic evidence to inform the parties' intent, the notice provision provides the timing of payment on outstanding invoices in the event the parties' "business relationship" extends beyond the term of the 2009 Agreement, which is not inconsistent with a March 2012 terminus for the 2009 Agreement's terms.

Second, North Coast argues that its own CFO has testified that it is customary when dealing with a staffing company to have an initial agreement that applies throughout the business relationship and for the rates to change periodically. [ECF No. 16 at 5]. Such an arrangement, even if customary in the industry, is insufficient to overcome the express terms of the 2009 Agreement, which provide that the Agreement expired on March 3, 2012. [ECF No. 15-4 at 1].

---

[3] Although there may be ambiguity as to whether the terms of the 2009 Agreement continued in effect until March 8, 2012, there is no indication that they were intended to extend beyond that date.

Third, North Coast argues that the absence of several critical terms from the 2012 Agreement indicates an intention to adopt the terms of the 2009 Agreement. [ECF No. 16 at 6]. Even assuming that the 2012 Agreement omitted some essential terms, the indemnity provision of the 2009 Agreement is not an essential term and cannot be supplied by the Court. Cf. Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc., 945 N.E.2d 964, 974 (Mass. App. Ct. 2011) ("Where the parties to a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances will be supplied by the court." (quoting Fay, Spofford & Thorndike, Inc. v. Mass. Port Authy., 387 N.E.2d 206, 210 (Mass. App. Ct. 1979))). Further, the 2012 Agreement contains a new insurance provision that obligates Diamond to "maintain general liability insurance and workers compensation insurance as well as all liabilities concerning unemployment benefits." [ECF No. 15-6]. This provision seems to intentionally narrow the insurance obligation in the 2009 Agreement, and the fact that it addresses insurance but not indemnity suggests that the indemnity obligation was intentionally omitted. Finally, it is difficult to see how the 2009 and 2012 insurance provisions could both be given effect, which suggests that the parties intended the 2012 Agreement to supplant rather than augment the 2009 Agreement.

Further, North Coast argues that it and Diamond impliedly extended the terms of their 2009 Agreement by continuing to operate in a manner consistent with the 2009 Agreement during the term of the 2012 Agreement. [ECF No. 16 at 8]. As an initial matter, North Coast does not allege that this continued operation includes Diamond indemnifying North Coast in similar circumstances. The purported conduct consistent with the 2009 Agreement consists of Diamond paying the wages and payroll taxes for its employees assigned to North Coast,

Diamond providing workers' compensation coverage for the temporary employees, and Diamond continuing to invoice North Coast and accept payment for services, which is equally consistent with the 2012 Agreement.  Id.  North Coast claims that this case is comparable to Mill-Bern Assocs., Inc. v. Dall. Semiconductor Corp., No. CIV. A. 98-1435-D, 2002 WL 1340853 (Mass. Super. June 13, 2002), but Mill-Bern is inapposite.  In Mill-Bern, the parties' written agreement expired in 1994, and the parties continued performing as if the contract had not expired.  Id. at *9.  The Superior Court held that a fact finder could determine either that the parties implicitly agreed to a series of annual renewals of their 1994 agreement or that their conduct implied an agreement to continue their relationship on an at-will basis.  Id.  Here, unlike Mill-Bern, the parties entered a new, written three-year agreement on March 9, 2012, after their 2009 Agreement expired, that specified different terms than those they agreed to in 2009. Diamond's conduct in paying its employees, providing worker's compensation, and billing North Coast is consistent with the 2012 Agreement, and does not imply a continuation of the terms of the expired 2009 Agreement.

IV.    **CONCLUSION**

Although the format and other aspects of the 2012 Agreement imply that North Coast and Diamond might have presumed that it was more of an updated rate sheet than an entirely new contract, the Court is unable, under the circumstances, to look to the intent of the parties and supplement the 2012 Agreement with a non-essential term where there is no ambiguity on the face of the contract.

Accordingly, PIIC's cross motion for summary judgment [ECF No. 21] is GRANTED. North Coast's motion for summary judgment [ECF No. 15] is DENIED.  The parties shall bear their own costs.

**SO ORDERED.**

March 31, 2019                                                    /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE